This is a suit under the Workmen's Compensation Act, No. 20 of 1914, as amended. Plaintiff seeks to recover compensation at the rate of $16.90 per week for a period of disability not to exceed four hundred weeks, beginning July 25, 1942, with five per cent per annum interest on each installment from due date until paid, and for $250 medical and hospital bills. He alleged he was totally and permanently disabled in an accident which occurred while he was performing labor for defendant and while acting within the course and scope of his employment, and that defendant was engaged in a hazardous occupation.
Plaintiff sued his employer and its compensation insurer and prayed for judgment against them, in solido. He further alleged that at the time he was injured, he was earning $26 per week and that he has been paid $15.60 per week up to and including December 8, 1942.
Defendants in answer categorically denied each and every allegation of plaintiff's petition. They further answered alleging that plaintiff was receiving wages of $24 per week and that they paid him compensation at the rate of $15.60 per week through February 5, 1943. They further alleged they have paid doctors' and hospital bills for plaintiff in the amount of $250. They alleged and averred that plaintiff did sustain *Page 368 
an accident while in the course of his employment with defendant, W.W. Kellogg Company, but that he was not severely injured and had fully recovered from all ill effects long prior to February 5, 1943.
The lower Court rejected plaintiff's demands and he is prosecuting this appeal. The lower Court did not favor us with a written opinion and we therefore do not know the reasons for its judgment.
On July 18, 1942, plaintiff was assisting in pulling a Georgia Buggy, loaded with concrete, up an incline at defendant's plant. There were three men in front pulling the Buggy and two pushing it from behind. Another Georgia Buggy was coming down the tramway and it struck the one plaintiff was pulling and knocked him off the tramway. He fell to the ground, a distance of from seven to nine feet, and was rendered unconscious. The ground was covered with concrete and lumber. Plaintiff was picked up by his fellow employees and soon thereafter carried in an ambulance to a sanitarium. It was several hours before plaintiff regained consciousness, at which time he complained of pain in his back, right wrist, head and knee. He remained in the sanitarium for a period of approximately twenty days and was then sent to his home. He remained there for a few days and his condition was such that he was carried again to the sanitarium where he was kept for approximately ten days, but after plaintiff was sent home this last time, he was conveyed backward and forward to a clinic or sanitarium for treatment in an ambulance for a period of about three weeks. The treatments given plaintiff were hypodermics to ease pain, Aspirin, and hot packs to the wrist, back, shoulder and head.
On December 8, 1942, defendants ceased treating plaintiff and discharged him as well and also ceased compensation payments. Upon receipt of a demand from plaintiff's attorney, they began again the compensation payments and further treatment of plaintiff with hot applications, and on February 5, 1943, they stopped compensation payments and treatment.
The only questions involved in this case are just what injuries plaintiff received in the accident, the extent of same and the amount of his weekly wage. The record makes it clear that plaintiff was employed to work and did work five ten-hour days and one eight-hour day each week at a salary of forty cents per hour for the first forty hours and sixty cents per hour, or time and a half for the eighteen hours overtime, or a total of $26.80 per week.
Plaintiff alleged and contends he received injuries to his back, head, side, knee, wrist and arm. The records fails to disclose any permanent injury other than possibly to his back and wrist. Plaintiff was involved in an accident in 1940, in which he received a back injury and for which he was paid compensation until such time as the Court held he had fully recovered. Although the record discloses that since the first injury his back was more susceptible to injury than it would otherwise have been, due to the conflicting testimony relative to the new back injury, we prefer to base our decision in this case upon the injury to the wrist, which the record shows to be permanently and totally disabling, if it is as contended by plaintiff, and that, instead of improving, will gradually grow worse and finally cause a completely stiff wrist on his right hand. It also shows there is no treatment which will improve it, other than an operation, which may or may not help it. A drawing or picture taken from a recognized medical authority is in the record showing the carpal bones of the hand and wrist and an x-ray plate of plaintiff's left hand, which was not injured. The two pictures are very similar and disclose, as testified by all doctors for the defense, that there are eight carpal bones between the fingers and the radius bone of the arm, and that only two of them articulate with the radius, they are the lunate and navicular, the latter being approximately twice the size of the lunate bone and by far the largest of the eight.
Two doctors testified for the plaintiff and stated that the x-ray plates of plaintiff's right hand and wrist definitely show that the large navicular, or scaphoid bone, has been fractured about its center and in the plate appears as though there were two bones instead of one. They testified it is so plain that even a layman can see it by holding the plate in front of a light without the use of a shadow-box. They also testified there was considerable traumatic arthritis present. The three doctors who testified for the defendants are of the opinion there is no fracture of the navicular or scaphoid bone, but find arthritis and are of the opinion it was caused by possible injury received when plaintiff was quite young or that it is not of traumatic origin. They admit the x-ray plate shows three *Page 369 
bones articulating with the radius, when in a normal hand or wrist there should only be two, and attempt to account for the small size of what they call the scaphoid by suggesting it is congenital or due to shrinkage, possibly from disease or an injury received in early childhood, and that as it shrank in size a third bone took place by the side of the lunate and navicular.
With all due respect to these learned medical men, it strikes us that their testimony in this case is very weak in their attempt to explain the admitted abnormalities in plaintiff's wrist. Counsel for plaintiff challenged the doctors for defendants, by questions, to show a plate or picture from any recognized medical authority where, in a wrist which had not been injured, it showed any of the bones other than the lunate and navicular articulating with the radius. No such picture was produced.
We are not trained to interpret x-ray plates and would not have the temerity to place our judgment or interpretation above skilled medical men, but, in passing, will say that it is apparent from a look at the plates filed in evidence that the wrist claimed by plaintiff to be injured is entirely different from the plate of his well hand and the picture in evidence taken from a recognized medical authority. The bone defined as the navicular or scaphoid by defense doctors in this plate is about half the size it should be, and when the line separating this bone from the adjoining one is obliterated, the two bones, as found by these doctors, are the approximate size of the navicular bone, as shown in the plaintiff's well hand and the medical authority picture.
Counsel for plaintiff stated that the x-ray plate of plaintiff's right wrist and hand so plainly showed a fracture of the navicular bone that he did not deem it necessary to produce a number of witnesses to prove it and, after the doctors for the defense denied there was a fracture, he sent the plate to the head of the X-ray Department of Mayo Bros., for an interpretation, and also submitted it to a doctor in Ruston, Louisiana. He received a wire from the doctor at Mayo's which reads as follows:
"X-ray showed fracture carpal scaphoid with arthritis.
"Dr. Ralph K. Ghormley."
The report from the doctor at Ruston was to the same effect. Counsel attached these documents to a motion for a new trial, which was overruled by the lower Court.
If there were any doubts in our minds about the case, we would consider remanding it in order that this evidence might properly be brought before the Court. The terms "scaphoid and navicular" are one and the same bone, the different names being given it by various medical men. We are convinced from the record as made up that plaintiff received a complete fracture of the large navicular or scaphoid bone of the wrist and that he is totally and permanently disabled from performing manual labor, the only kind of work he is capable of doing, and that he is entitled to compensation at the rate of 65% of his weekly wages for a period not to exceed four hundred weeks, less a credit of the amount of compensation heretofore paid by defendant. The record shows that defendants have paid all medical and hospital bills and that plaintiff is not entitled to any additional amount.
Although plaintiff alleged his weekly wage was $26 per week, it was in fact $26.80 per week, and the Compensation Law fixes the amount of his compensation at 65% of his weekly wage, which would be $17.42 per week instead of $16.90 per week, for which he sued. This evidence as to the amount of his weekly wage was admitted without objection and to that extent enlarged the pleadings as to the amount claimed by plaintiff and due him.
It therefore follows that the judgment of the lower Court, insofar as it rejected the demands of plaintiff, is now reversed and there is judgment for plaintiff against W.W. Kellogg Company and Aetna Casualty Surety Company in the sum of $17.42 per week for a period of not more than four hundred weeks, beginning July 25, 1942, with five per cent per annum interest on each past due payment beginning from due date, until paid, less the amount of compensation paid to plaintiff between the dates of July 18, 1942, and February 5, 1943. In all other respects the judgment of the lower Court is affirmed; costs of both courts to be paid by the defendants.
 On Application for Rehearing.